# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

№ 06-CV-2610 (JFB)(GRB)

————————————

RAHEEM CREWS, INDIVIDUALLY AND AS PARENT OF SHAHEEM CREWS,

Plaintiff,

VERSUS

COUNTY OF NASSAU, ET AL.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
February 11, 2014

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Raheem Crews ("plaintiff") was arrested, detained, and prosecuted for a robbery he did not commit. After plaintiff's arrest, the lead detective on the case, defendant Nicholas Lemma ("Det. Lemma"), learned that plaintiff had been in jail at the time of the robbery (for an unrelated incident), but Det. Lemma kept this information to himself. Thereafter, plaintiff spent almost four additional months in jail before his alibi was confirmed, and the indictment against him was dismissed.

Now plaintiff, individually and as parent of Shaheem Crews, brings this civil rights action against the County of Nassau (the "County"), County Police Deputy Inspector Joseph Barbieri ("Dep. Insp. Barbieri"), County Police Detective Lieutenant Andrew Fal ("Det. Lt. Fal"), County Police Detective John Holland ("Det. Holland"), County Police Detective Donald Messe ("Det. Messe"), County Police Officer Ronald Annarumma ("Officer Annarumma"), County Assistant District Attorney Greg Madey ("ADA Madey"), County Assistant District Attorney Kevin Higgins ("ADA Higgins") (collectively, the "County defendants"), and Det. Lemma (collectively, "defendants").[1] Pursuant to 42 U.S.C.

---

[1] The Court dismissed plaintiff's claims against the Nassau County Police Department, the Nassau County Sheriff's Department, and the Nassau County District Attorney's Office in a prior order. *See Crews v. Cnty. of Nassau*, No. 06-CV-2610 (JFB)(WDW), 2007 WL 4591325, at *18 (E.D.N.Y. Dec. 27, 2007). Since then, plaintiff has voluntarily discontinued all claims against the following additional defendants named in plaintiff's complaint: James Lawrence, Robert Bishop, John Haviken, David Mack, Denis Monette, Raymond Crawford, Herbert Faust, Patrick O'Connor, Edward Reilly, Denis Dillon, and Matthew Lampert. (*See* Pl.'s Mem. in Opp. to County Defs.' Supp. Mot. for Summ. J. 14.) The Court dismisses the claims against those defendants, with

§ 1983 ("Section 1983") and New York state law, plaintiff alleges causes of action for false arrest, false imprisonment, and malicious prosecution. Plaintiff also brings the following causes of action under state law: assault, battery, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED").[2] He seeks monetary damages and injunctive relief.[3]

Presently before the Court are the County defendants' motion for summary judgment, Det. Lemma's motion for summary judgment, and plaintiff's motion for summary judgment against Det. Lemma. For the reasons that follow, the County defendants' motion is granted in part and denied in part, Det. Lemma's motion is granted in part and denied in part, and plaintiff's motion is denied. Specifically, first, summary judgment for all defendants is warranted on plaintiff's false arrest and false imprisonment claims because the robbery victim's identification of plaintiff in a photo array furnished defendants with the probable cause necessary to arrest plaintiff. Moreover, although plaintiff contends that there is evidence that one of the actual perpetrators of the robbery told certain defendants that plaintiff had not participated in the robbery, such evidence does not vitiate the probable cause established by the victim's identification of plaintiff, given the complete absence of any evidence that the identification procedure was suggestive. Second, the Court grants summary judgment to all individual defendants except Det. Lemma on plaintiff's malicious prosecution claim. With respect to Det. Lemma's liability for malicious prosecution, there is, *inter alia*, evidence that Det. Lemma became aware that plaintiff was in jail at the time of the robbery, but withheld that exculpatory evidence from prosecutors. In fact, in his deposition, Det. Lemma stated, "I kept it to myself and said 'Let the chips fall where they may.'" (Decl. of Valerie M. Cartright ("Cartright Decl.") Ex. G, Dep. of Nicholas Lemma, Feb. 24, 2009 ("Lemma Dep.") 48.) Thus, Det. Lemma is not entitled to summary judgment on this claim. However, plaintiff is also not entitled to summary judgment because, based upon the record in this case, there is a genuine issue of disputed fact as to whether the withholding of the exculpatory information by Det. Lemma was done with malice, as required for a malicious prosecution claim. However, defendants ADA Madey and ADA Higgins are entitled to summary judgment on the malicious prosecution claim on the basis of absolute prosecutorial

---

[2] Plaintiff also alleges "Punitive Damages" as a separate cause of action. The County defendants note correctly that there is no independent cause of action for punitive damages in New York. *See, e.g., IMR Assocs., Inc. v. C.E. Cabinets, Ltd.*, No. 06-CV-5965 (JFB)(ETB), 2007 WL 1395547, at *8 (E.D.N.Y. May 11, 2007). Accordingly, the Court dismisses plaintiff's cause of action for punitive damages. Of course, plaintiff remains free to seek punitive damages with respect to those causes of action that survive summary judgment.

[3] Specifically, plaintiff seeks an injunction requiring defendants "to correct all past violations of federal and state law and well established ethical and professional standards as alleged herein and to enjoin defendants from continuing to violate federal and state law and well established ethical and professional standards as alleged herein." (Compl. ¶ 485.) The County defendants argue that plaintiff is not entitled to such an injunction, as he is no longer in the County's custody. (County Defs.' Mem. in Supp. of Mot. for Summ. J. 3.) Because plaintiff does not respond to the County defendants' argument, the Court finds that plaintiff has abandoned his claim for injunctive relief, and dismisses this claim. *See, e.g., Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2).

immunity. Further, all other defendants are entitled to summary judgment on this claim because there is no evidence establishing that they ever learned of plaintiff's alibi for the robbery. As for the municipal liability claim against the County, a triable issue of fact exists concerning the County's failure to train or supervise Det. Lemma, such that a reasonable jury could find the County liable under Section 1983. In addition, the County could be held liable on plaintiff's corresponding state law malicious prosecution claim under a theory of *respondeat superior*. Third, all defendants except Officer Annarumma and the County are entitled to summary judgment on plaintiff's assault and battery claims, which plaintiff based on the degree of force used to handcuff him. A triable issue of fact exists concerning the degree of force Officer Annarumma use in arresting plaintiff, and the Court cannot determine at this juncture whether Officer Annarumma is entitled to qualified immunity. The County's liability hinges on Officer Annarumma's liability, on a theory of *respondeat superior*. However, no other defendants can be held liable for assault and battery, because there is no evidence of their involvement in plaintiff's handcuffing. Fourth, the Court grants summary judgment to all defendants on plaintiff's IIED and NIED claims, on the grounds that plaintiff has failed to produce medical evidence of his emotional distress, and that these claims are duplicative of his other claims.

## I. Background

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmoving party. *See, e.g.*, *Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it.[4]

### 1. Robbery of Levi Smith

On March 26, 2005, Levi Smith ("Smith") called 911 to report that he had been robbed at knifepoint. (County's 56.1 Statement ¶ 41.) In a supporting deposition given to the Nassau County Police Department ("NCPD"), Smith described the perpetrators as three African-American men who were approximately seventeen to eighteen years old. (*Id.* ¶¶ 42–43.) According to Smith, one of the young men was wearing a black and orange jacket, and another was wearing a black jacket with orange lining. (*Id.* ¶ 43; Decl. of Sherri A. Jayson ("Jayson Decl.") Ex. 9, Supporting Dep. of Levi Smith, Mar. 26, 2005.)

At the time, Det. Lt. Fal was the commanding officer for the NCPD First Precinct detectives (County's 56.1 Statement ¶ 31), and Det. Lemma was one of the detectives under Det. Lt. Fal's command (Lemma's 56.1 Statement ¶ 6). On March 28, 2005, Det. Lemma was responsible for the intake of cases transferred to the detective's unit for investigation, and Det. Lemma assigned the Smith robbery to himself. (County's 56.1 Statement ¶¶ 30, 45; Lemma Dep. at 11–12.) During his investigation, Det. Lemma learned that Naquarn Hughlett ("Hughlett") might have been one of the three young men

---

[4] Although the parties' respective Rule 56.1 statements of facts contain specific citations to the record, the Court cites to the Rule 56.1 statement instead of the underlying citation to the record.

involved in the robbery. (County's 56.1 Statement ¶ 46.) Det. Lemma presented Smith with a photo array that included a picture of Hughlett, and Smith identified Hughlett as one of the young men who had robbed him. (Lemma's 56.1 Statement ¶ 6; Lemma Dep. at 30–31.)

## 2. Hughlett's Arrest and Interrogation

Hughlett was arrested on May 26, 2005. (County's 56.1 Statement ¶ 47.) He was taken to the First Precinct, where he gave a statement to Det. Lemma and others concerning his involvement in the Smith robbery. (Lemma Dep. at 32–34.) It is undisputed that Hughlett admitted to his participation in the crime and signed a written statement identifying "Eastside" and "Tray Pound" as the two other perpetrators of the robbery. (County's 56.1 Statement ¶ 48; Lemma's 56.1 Statement ¶ 6.) Hughlett's statement also indicates that "East Side" was wearing a black jacket with orange lining during the robbery. (County's 56.1 Statement ¶ 49; Cartright Decl. Ex. N, Statement of Naquarn Hughlett, May 26, 2005.)

There is conflicting evidence, however, about what Hughlett actually communicated to investigating officials after his arrest. According to Det. Lemma, Hughlett implicated two other men with the nicknames "Eastside" and "Tray Pound," which corresponds to the written statement that Hughlett signed. (Lemma Dep. at 34.) Hughlett has provided a different account of what happened before and after his arrest, first in a sworn video statement made on December 9, 2005, and later in a deposition on March 28, 2012.

In his video statement, Hughlett explained that, several weeks before his arrest, he and plaintiff had been standing in front of a delicatessen when police officers approached them and asked for identification. (Cartright Decl. Ex. GG, Videotaped Statement of Naquarn Hughlett, Dec. 9, 2005 ("Hughlett Video Statement") 3.) The officer told plaintiff that they would "lock him up" next time if he failed to report to probation. (*Id.*) Thereafter, a few days before his arrest, Hughlett observed a police detective taking pictures of him and his friends, among whom were plaintiff and Lorenzo Miller ("Miller"). (*Id.* at 4.) The detective told the group that if the police returned, they would know "who they're coming to get." (*Id.*) Then, on May 26, 2005, the police arrested Hughlett. (*Id.* at 5.) Plaintiff was with Hughlett at the time of Hughlett's arrest, but plaintiff himself was not arrested. (*Id.*)

According to Hughlett, upon arrival at the First Precinct, he spoke to someone from the Nassau County District Attorney's Office ("D.A.'s Office"), whom he described as a white, "chubby guy with glasses." (*Id.* at 5.) The man from the D.A.'s Office and a detective asked Hughlett to sign a statement implicating others in the Smith robbery, but Hughlett refused to sign it. (*Id.* at 6.) In addition, the investigating officials encouraged Hughlett to implicate plaintiff, but Hughlett told them that plaintiff had not been present during the robbery. (*Id.* at 6–7, 9.) One detective insisted that Hughlett was lying and stated, "I'm trying to give you a break. Come on, just tell us if he was there or not. That's all you gotta do." (*Id.* at 9.) After the interrogation ended, Hughlett was taken to jail. (*Id.* at 7.)

Hughlett recounted a similar course of events in his deposition. He testified that he spoke first with a "white guy with glasses," who was "kind of chunky." (Decl. of Frederick K. Brewington ("Brewington

4

Decl.") Ex. 7, Dep. of Naquarn Hughlett, Mar. 28, 2012 ("Hughlett Dep.") 40, 44.) Hughlett later identified this man in a photo array as ADA Madey. (County's Supplemental 56.1 Statement ¶¶ 4–5.) Sometime after that, four detectives entered the room, and one of them grabbed Hughlett by the shirt collar. (Hughlett Dep. at 45–48.) The officers began showing him pictures of other people. (*Id.* at 48.) On several occasions, one of the officers slapped Hughlett on the back of the head. (*Id.* at 51–52.) The police then led Hughlett to a second room, in which the "white guy with glasses" and two police officers were present. (*Id.* at 65.) Hughlett maintained that he had been the only one involved in the Smith robbery, and that neither plaintiff nor Miller had been involved. (*Id.* at 69–70.) The investigating officials presented Hughlett with a written statement and told him that if he did not sign it, then the police would "add more charges." (*Id.* at 72–73.) Hughlett read "just like the first page" but was not shown the rest of the statement. (*Id.* at 71–72.)

### 3. Plaintiff's Arrest

Det. Lemma testified that, after interviewing Hughlett, he asked officers in the First Precinct's Gang Unit if they knew the identities of "Eastside" and "Tray Pound." (Lemma Dep. at 34–35.) According to Det. Lemma, someone in the Gang Unit informed him that "Eastside" was Miller and "Tray Pound" was plaintiff. (*Id.* at 35.) Det. Lemma prepared a photo array of six young African-American men, including plaintiff, to show to Smith. (County's 56.1 Statement ¶ 54.) On May 26, 2005, Smith reviewed the photo array and identified plaintiff as one of the men who had robbed him. (*Id.* ¶ 55; Jayson Decl. Ex. 12, Supporting Dep. of Levi Smith, May 26, 2005.)

After Smith identified plaintiff, Officer Annarumma was directed to arrest plaintiff.[5] (County's 56.1 Statement ¶ 56.) Along with two other officers (not parties to this action), Officer Annarumma arrested plaintiff on May 27, 2005 and brought him to the NCPD First Precinct. (County's 56.1 Statement ¶¶ 56–58; *see* Annarumma Dep. at 26–27.) At the time of his arrest, plaintiff was wearing a black jacket with orange lining. (County's 56.1 Statement ¶ 66.) Although plaintiff did not resist arrest (Pl.'s 56.1 Statement ¶ 143), plaintiff asserts that he was "aggressively and improperly handcuffed," which caused "soreness and bruising" of his wrists and a shoulder injury (*Id.* ¶ 191). Specifically, plaintiff testified that the arresting officer hurt his arm by twisting it around his back. (Cartright Decl. Ex. MM, Dep. of Raheem Crews, Mar. 1, 2006 ("Crews 2006 Dep.") 14.) When plaintiff told them he was in pain, the officer told him to "[s]hut up." (*Id.*) Then, on the way to the precinct, plaintiff repeated to the officers that they had hurt his arm, but none of them responded. (*Id.* at 16.) Plaintiff testified that his wrist pain lasted a few hours, and that a "sharp pain" in his shoulder lasted for approximately one week. (*Id.* at 15; Cartright Decl. Ex. O, Dep. of Raheem Crews, Aug. 12, 2008 ("Crews 2008 Dep.") 47–48.) Although plaintiff claims to have told the arresting officers that he was in pain, plaintiff neither reported any injuries when questioned about his physical condition at the First Precinct, nor did he

---

[5] There is some dispute about Det. Lemma's involvement in plaintiff's arrest. The property bureau invoice for plaintiff's arrest lists Det. Lemma as the arresting officer. (Cartright Decl. Ex. Q.) However, Officer Annarumma testified that he arrested plaintiff after speaking to Det. Messe and Det. Holland (Cartright Decl. Ex. D, Dep. of Ronald Annarumma, Dec. 9, 2010 ("Annarumma Dep.") 24–25), and Det. Lemma testified that he was not working on the day of plaintiff's arrest (Lemma Dep. at 39–40).

seek medical treatment. (County's 56.1 Statement ¶¶ 59, 61.)

Det. Messe reviewed the police paperwork and notes in the case file, and discussed the case with Det. Lemma on the phone. (County's 56.1 Statement ¶ 69; Lemma's 56.1 Statement ¶ 11.) Then, Det. Messe read plaintiff his rights and had plaintiff sign a Miranda waiver. (County's 56.1 Statement ¶ 70.) Det. Messe questioned plaintiff about his involvement in the Smith robbery, and after plaintiff refused to speak, Det. Messe and Det. Holland began to process plaintiff's arrest. (*Id.* ¶¶ 70–71.)

Det. Holland entered the date, time, and location of the Smith robbery into the NCPD's "Swift Justice" computer program. (*Id.* ¶ 74.) By default, "Swift Justice" lists the date of offense to be the same as the date of arrest. (*Id.* ¶ 77.) Thus, in entering the information for plaintiff's arrest, Det. Holland had to change the date of offense, which had been listed as May 27, 2005 (the date of arrest). (*Id.*) In doing so, Det. Holland incorrectly typed the date of offense as April 26, 2005, instead of March 26, 2005. (*Id.* ¶¶ 77–78.) Holland attributes this inaccuracy to a "typographical error"—entering "04" (April) instead of "03" (March) for the month of the date of offense. (Cartright Decl. Ex. H, Dep. of John M. Holland, Dec. 16, 2010 ("Holland 2010 Dep.") 24.) According to Det. Holland's testimony, the information that he entered into "Swift Justice" was then used to generate a felony complaint. (*Id.* at 17–19.) Because Det. Holland entered the wrong date of offense into "Swift Justice," the felony complaint incorrectly charged plaintiff with having committed the robbery on April 26, 2005. (County's 56.1 Statement ¶¶ 78–79.)

Dep. Insp. Barbieri was the desk officer working at the time of plaintiff's arrest. As desk officer, Dep. Insp. Barbieri was responsible for reviewing the arrest paperwork in order to ensure its accuracy. (Lemma's 56.1 Statement ¶ 15; Cartright Decl. Ex. L, Dep. of Joseph Barbieri, Dec. 9, 2010 ("Barbieri Dep.") 14–17.) Dep. Insp. Barbieri and Officer Annarumma signed the felony complaint, although Officer Annarumma testified that he never actually read it because "it [was] prepared by a detective who is trained to do it and then it is reviewed by a desk officer who gets paid a lot more than I do." (Lemma's 56.1 Statement ¶ 14; Annarumma Dep. at 36.)

On May 28, 2005, plaintiff was arraigned on a charge of robbery in the first degree. (County's 56.1 Statement ¶ 88.) Plaintiff was unable to post bail and remained in custody. (*Id.* ¶ 89.)

### 4. Miller's Arrest and Interrogation

At some point in his investigation, Det. Lemma prepared a photo array of six young men, including Miller, to show to Smith. (*Id.* ¶ 91.) Smith identified Miller as one of the men who had robbed him, and, consequently, Miller was arrested on May 31, 2005. (*Id.* ¶¶ 92–93.)

Det. Lemma questioned Miller the next day, June 1, 2005. (*Id.* ¶ 96.) During the interrogation, Miller admitted that he and Hughlett had been involved in the robbery; however, he insisted that plaintiff had not participated in the robbery. (*Id.*) Moreover, Miller told Det. Lemma that plaintiff could not have committed the robbery because plaintiff had been in jail on March 26, 2005.[6] (*Id.*)

---

[6] During the interrogation, Det. Lemma referred to plaintiff as "Mookie" and "Tray Pound," but Miller

Det. Lemma checked the jail records and confirmed that plaintiff had been in jail from March 24, 2005 to March 31, 2005. (*Id.* ¶ 97; Lemma Dep. at 47–48.) Despite his discovery of conclusive evidence that plaintiff could not have committed the Smith robbery, Det. Lemma did nothing to ensure the dismissal of charges against plaintiff. (County's 56.1 Statement ¶ 98.) In his deposition, Det. Lemma stated, "I kept it to myself and said 'Let the chips fall where they may.'" (Lemma Dep. at 48.) Det. Lemma explained further that he had assumed the error would have been picked up by the time of plaintiff's arraignment—an assumption premised on the mistaken belief that the felony complaint contained the correct date of offense. (*Id.* at 50–51.) Det. Lemma could not remember whether he informed anyone about plaintiff's alibi.[7] (Lemma Dep. at 48–49.)

5. Prosecution of Plaintiff

ADA Higgins was assigned to prosecute plaintiff, Hughlett, and Miller (Lemma's 56.1 Statement ¶ 23), and Arshad Majid ("Majid") was appointed to represent plaintiff (Pl.'s 56.1 Statement ¶ 9). On or about June 10, 2005, Majid informed the DA's Office that certain individuals could establish an alibi for plaintiff on April 26,

2005—the incorrect date of offense listed on the felony complaint. (County's 56.1 Statement ¶ 105.) ADA Higgins phoned Det. Messe and asked him to interview these potential alibi witnesses. (*Id.* ¶ 108.) Thereafter, on July 12, 2005, Det. Messe and Det. Holland visited Shamika Dawson and Donnisa Brown, who provided the detectives with an alibi for plaintiff on April 26, 2005. (*Id.* ¶ 109.) According to Det. Messe, after interviewing the alibi witnesses, he believed "that there was a possibility that [plaintiff] was being looked at for a different crime that might have occurred on April 26th of 2005 as opposed to the robbery that I processed him on." (Messe Dep. at 103–04.) Nonetheless, Det. Messe reported the alibi information to ADA Higgins via fax and wrote on the cover page, "Date (provided by both witnesses) was verified numerous times." (County's 56.1 Statement ¶ 112.) In addition, ADA Higgins testified that Det. Messe called him and left a message informing him that the alibi witnesses had the wrong date. (Cartright Decl. Ex. AA, Dep. of Kevin Higgins, Feb. 25, 2009 ("Higgins 2009 Dep.") 36.) ADA Higgins remembers receiving the message on July 13, 2005. (Cartright Decl. Ex. CC, Dep. of Kevin Higgins, Dec. 20, 2010 ("Higgins 2010 Dep.") 30.) ADA Higgins testified that, after receiving Det. Messe's message, he reviewed the documents in plaintiff's case and determined that the felony complaint listed the wrong date of offense. (Higgins 2009 Dep. at 36–37.)

The record is unclear as to when ADA Higgins first notified Majid of the error on the felony complaint. ADA Higgins claims that he informed Majid within days of discovering the error, and that he asked Majid if plaintiff had an alibi for March 26, 2005—the actual date of the Smith robbery. (*Id.*; Higgins 2010 Dep. at 42–43.) Contrary

---

knew plaintiff only by the nickname "Mookie." (Cartright Decl. Ex. KK, Video Statement of Lorenzo Miller, Oct. 25, 2005, at 10–11.)

[7] Det. Messe testified that, after plaintiff's arrest, he did not speak to Det. Lemma until September 2005 (Lemma's 56.1 Statement ¶ 20), when Det. Lemma told him in an "offhand" remark that there may have been "a problem with the Raheem Crews case" and that plaintiff "might have been in jail at the time that the robbery took place" (Cartright Decl. Ex. F, Dep. of Donald Messe, Dec. 16, 2010 ("Messe Dep.") 107–08, 110). Det. Messe interpreted this to mean "that Detective Lemma had information that came to his attention that he would hopefully act accordingly on." (*Id.* at 109.)

to ADA Higgins's testimony, Majid claims that he did not learn of the error on the felony complaint until August 15, 2005. (Cartright Decl. Ex. A, Dep. of Arshad Majid, Dec. 24, 2010 ("Majid Dep.") 51–52.) Moreover, according to Majid, even after August 15, 2005, ADA Higgins refused to send Majid amended paperwork correcting the date of offense on the felony complaint. (Pl.'s 56.1 Statement ¶ 37.)

In the meantime, Hughlett pleaded guilty to the charges against him on July 18, 2005. (County's 56.1 Statement ¶ 115.) During his plea allocution, Hughlett implicated plaintiff in the Smith robbery. (*Id.*)

### 6. Grand Jury Indictment

ADA Madey took over the prosecution of plaintiff in late July 2005. (*Id.* ¶¶ 117–18.) At a conference held on July 22, 2005, Majid waived plaintiff's case to the grand jury. (*Id.* ¶ 117.) Thereafter, the D.A.'s Office sent grand jury notices to Majid on August 17, 2005, August 18, 2005, and August 23, 2005. (*Id.* ¶ 119.) Majid testified that, on August 17, 2005, he left ADA Madey a voice message explaining that he did not understand why the case against plaintiff was moving forward, given that plaintiff had been in jail on March 26, 2005.[8] (Majid Dep. at 70.) The County disputes this fact, emphasizing that Majid did not serve a notice of alibi until September 27, 2005. (County's Response to Pl.'s 56.1 Statement ¶ 45.)

ADA Madey presented the case against plaintiff and Miller to the grand jury on August 31 and September 1, 2005. (County's 56.1 Statement ¶ 121; *see* Cartright Decl. Ex. HH, Tr. of Grand Jury

Proceedings, *People v. Miller & Crews* (Nassau Cnty. Grand Jury Aug. 31, 2005) ("Aug. 31, 2005 Grand Jury Proceedings"); Cartright Decl. Ex. JJ, Tr. of Grand Jury Proceedings, *People v. Miller & Crews* (Nassau Cnty. Grand Jury Sept. 1, 2005) ("Sept. 1, 2005 Grand Jury Proceedings").) Smith and Det. Lemma testified that Smith had identified plaintiff in a photo array. (*See* Aug. 31, 2005 Grand Jury Proceedings, at 11–12; Sept. 1, 2005 Grand Jury Proceedings, at 6.) In addition, Hughlett testified that he committed the robbery with plaintiff and Miller; this time, however, he identified plaintiff as "East Side" and Miller as "Tray Pound." (Sept. 1, 2005 Grand Jury Proceedings, at 11.)

On September 8, 2005, the grand jury returned an indictment charging plaintiff with robbery in the second degree and robbery in the third degree. (County's 56.1 Statement ¶ 124.) At plaintiff's arraignment on September 22, 2005, Majid informed the court that the felony complaint had listed the wrong date. (*Id.* ¶ 125.) Although he described the prosecution's case as "weak," he did not explain that plaintiff had been in jail on March 26, 2005, the actual date of the robbery. (*Id.* ¶ 126.) Majid claims, however, that he raised plaintiff's alibi before the arraignment proceedings began, in front of a clerk in the judge's chambers (but not the judge) and ADA Madey. (Majid Dep. at 99–100.)

### 7. Dismissal

Majid served a notice of alibi on September 27, 2005, which explained that witnesses could establish plaintiff's incarceration for the period from March 24, 2005 to March 31, 2005. (County's 56.1 Statement ¶ 129; Cartright Decl. Ex. LL, Notice of Alibi.) That same day, the court requested and received plaintiff's arrest

---

[8] As noted above, Majid knew by August 15, 2005 at the latest that the date of the Smith robbery was March 26, 2005, not April 26, 2005.

history from the New York State Department of Corrections. (County's 56.1 Statement ¶ 129.) Two days later, the court contacted the D.A.'s Office, who consented to the release of plaintiff on his own recognizance. (*Id.* ¶ 130.) The charges against plaintiff were dismissed on October 17, 2005. (*Id.* ¶ 131.)

### 8. Plaintiff's Injuries

In addition to his temporary wrist and shoulder pain, discussed *supra*, plaintiff claims that he was strip searched at least thirty times while in jail; subjected to demeaning, cruel, and abusive behavior; and lived in unsanitary conditions that included rodents, roaches, mold, and foul odors. (Pl.'s 56.1 Statement ¶¶ 193–96.) Plaintiff felt "public disgrace" and "humiliation" during his incarceration (*id.* ¶ 192), and suffered from depression, which he discussed with a doctor (County's 56.1 Statement ¶¶ 62–63).

### B. Procedural History

Plaintiff filed the complaint in this action on May 25, 2006. On September 5, 2006, the case was reassigned from Judge Leonard D. Wexler to the undersigned. On January 30, 2007, the Court disqualified Majid and his firm from representing plaintiff, and plaintiff retained new counsel. On December 27, 2007, the Court granted in part and denied in part defendants' motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). *See generally Crews*, 2007 WL 4591325.

The County defendants filed a motion for summary judgment on July 11, 2011. Det. Lemma filed a motion for summary judgment on July 20, 2011. Plaintiff filed responses to both motions on September 15, 2011, and, on the same date, cross-moved for summary judgment against Det. Lemma.

The Court heard oral argument on November 21, 2011. At oral argument, the Court ordered discovery to be reopened for the limited purpose of obtaining Hughlett's sworn statement.

On May 21, 2012, after discovery was completed, the County defendants and Det. Lemma filed supplemental memoranda in support of their motions for summary judgment. Plaintiff filed responses to these motions on July 9, 2012. The County defendants and Det. Lemma filed replies on July 30, 2012. The Court heard oral argument on November 4, 2013. The Court has fully considered the submissions of the parties.

### II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

### A. Hughlett's Credibility

As an initial matter, defendants contend that no reasonable jury could credit Hughlett's video statement and deposition testimony, in which he contends that he told authorities that plaintiff was not involved in the Smith robbery and was coerced to falsely implicate plaintiff in the robbery. Defendants rely principally on the fact that Hughlett's video statement and deposition testimony contradict his three prior statements, in which he implicated plaintiff: his signed, written statement following his arrest; his plea allocution; and his grand jury testimony. For the reasons set forth below, the Court cannot disregard Hughlett's more recent statements as a matter of law simply because they contradict his three prior statements.

The standard rule is that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. However, in *Jeffreys v. City of New York*, the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact are statements by the plaintiff, which are so lacking in credibility that no reasonable juror could find for the plaintiff. 426 F.3d 549, 555 (2d Cir. 2005); *see Blake v. Race*, 487 F. Supp. 2d 187, 202–03 (E.D.N.Y. 2007).

In affirming the dismissal of the plaintiff's suit on summary judgment, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that [plaintiff's] testimony—which was largely unsubstantiated by any other direct evidence—

was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 475 (S.D.N.Y. 2003)); *see Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) (holding that plaintiff failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel*, No. 93-CV-8588 (JSM), 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiff's] complaint or in her subsequent missives to the court"). Although *Jeffreys* and these other cases involved a court declining to credit the unreliable testimony of a *party* to the lawsuit, as opposed to a *witness*, "the Court is willing to assume that *Jeffreys* could be extended to exceptional circumstances where a witness' testimony is so fanciful and lacking in any corroboration that it could be insufficient to create an issue of fact because no rational jury could believe it." *Blake*, 487 F. Supp. 2d at 203.

Here, defendants contend that no reasonable jury could believe Hughlett's account of what he told investigating officials—specifically, that he told them that plaintiff had not committed the robbery—because Hughlett previously implicated plaintiff on three separate occasions. Moreover, defendants highlight certain testimony in Hughlett's deposition that does not comport with established facts. For example, at his deposition, Hughlett claimed to have never seen the chunky white male with glasses (ADA Madey) after his initial interrogation; however, it is undisputed that ADA Madey was present for Hughlett's plea allocution and examined Hughlett before the grand jury. As such, defendants argue that Hughlett's video statement and deposition testimony are incredible as a matter of law.

The Court disagrees. Hughlett's video statement and deposition testimony are not merely inconsistent with his three prior statements; they assert that his three prior statements were the product of coercion. In similar circumstances at the summary judgment stage, courts have declined to discredit a later, inconsistent statement. *See Harper v. City of Murphysboro*, Civil No. 08-182-GPM, 2009 WL 331362, at *1 (S.D. Ill. Feb. 11, 2009) (refusing to discredit a witness's affidavit claiming that his prior trial testimony implicating plaintiff in a crime was the product of police coercion, and concluding that the witness's "credibility will be a question for the jury"); *see also United States v. Zhong*, No. C 11-5112 MEJ, 2012 WL 6201348, at *11 (N.D. Cal. Dec. 12, 2012) (refusing to discredit defendant's deposition testimony recanting his prior affidavit, where the later testimony asserted that the prior affidavit was made under duress, because such a determination would involve an improper assessment of credibility). Indeed, it is undisputed that Hughlett falsely implicated plaintiff in his

written statement, plea allocution, and grand jury testimony. His later statements offer an explanation for why did so (coercion). Whether a jury accepts this explanation depends upon an assessment of Hughlett's credibility.

As for any remaining inconsistencies or inaccuracies in Hughlett's deposition testimony, defendants could certainly employ these to impeach Hughlett's trial testimony. However, the Court is not persuaded that certain discrepancies in Hughlett's testimony bar its admissibility as a matter of law. In fact, close examination of Hughlett's prior three statements reveals numerous inconsistencies, as well. For example, during his plea colloquy, Hughlett stated that he did not know plaintiff as "Raheem Crews" but knew him as "Tray Pound."[9] Before the grand jury, however,

Hughlett identified plaintiff as "East Side" and Miller as "Tray Pound." (Sept. 1 Grand Jury Proceedings, at 11.) It remains a jury's task to sort through Hughlett's versions of events and to credit or discredit them as they see fit.

In sum, the Court concludes that it cannot disregard Hughlett's video statement and deposition testimony as a matter of law.

B. Plaintiff's Claims Under Section 1983

To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993).

Moreover, "[c]laims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (quoting *Weyant*, 101 F.3d at 852 (false arrest) and citing *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (malicious prosecution)). Accordingly, in this section, the Court considers both

---

[9] In fact, when asked about the identity of his accomplices, Hughlett provided only Miller's name. As the following colloquy demonstrates, ADA Madey was the one who supplied plaintiff's name and the nickname "Tray Pound" to Hughlett.

> THE COURT: Who were you with?
> [HUGHLETT]: Me and two other boys.
> THE COURT: What were their names?
> [HUGHLETT]: I didn't know the other boy's name, only one boy's name.
> THE COURT: Who's that?
> [HUGHLETT]: Lorenzo.
> THE COURT: Know his last name?
> [HUGHLETT]: No.
> THE COURT: People?
> [ADA MADEY]: Was it Lorenzo Miller?
> [HUGHLETT]: Yes.
> [ADA MADEY]: Raheem Crews, was that the other person?
> [HUGHLETT]: Yes.
> MR. BERGER: Did you know him as "Raheem Crews"?

> [HUGHLETT]: No. I didn't know him like that.
> [ADA MADEY]: Did you know him as a street name, "Traypound"?
> [HUGHLETT]: Yes.

(Cartright Decl. Ex. II, Tr. of Plea Allocution at 13, *People v. Hughlett*, No. 2005NA010445 (Nassau Cnty. Dist. Ct. July 18, 2005).)

plaintiff's Section 1983 claims for false arrest, false imprisonment, and malicious prosecution, and his corresponding state law claims.

### 1. False Arrest and False Imprisonment

Defendants move for summary judgment on the false arrest and false imprisonment claims against them on the grounds that the police had probable cause to arrest plaintiff. For the reasons set forth below, the Court agrees, and grants defendants' motions for summary judgment as to these claims.

Under New York law, "the tort of false arrest is synonymous with that of false imprisonment," and courts use that tort to analyze an alleged Fourth Amendment violation in the Section 1983 context. *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement and (4) the confinement was not otherwise privileged." *Broughton v. New York*, 37 N.Y.2d 451, 456 (1975). In the instant case, only the final element is in dispute; defendants argue that plaintiff's arrest was privileged because it was supported by probable cause. *See Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("'The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest. . . .'" (quoting *Weyant*, 101 F.3d at 852) (internal citations omitted)).[10]

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. Further, the "validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. Cnty. of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Under the collective knowledge doctrine, if one law enforcement officer has probable cause to arrest, cooperating law enforcement officers are deemed to have probable cause as well. *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983))).

At the summary judgment stage, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (internal citations omitted). "Even where factual disputes exist, as in this case, a § 1983 claim may fail if the plaintiff's version of events establishes probable cause to arrest." *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).

---

[10] "The same holds true for the false imprisonment claims because, under New York law, the claim is identical to a false arrest claim . . . ." *Kilburn v. Vill. of Saranac Lake*, 413 F. App'x 362, 363 (2d Cir. 2011).

In arguing that the police had probable cause to arrest plaintiff, defendants rely primarily on Smith's identification of plaintiff in the photo array. Plaintiff counters that (1) Smith's identification of plaintiff was the product of an improperly suggestive photo array; and (2) in any event, Hughlett's statement to the police, informing them that plaintiff had not participated in the robbery, vitiated the probable cause created by Smith's identification. The Court considers each of plaintiff's arguments in turn.

"An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest *absent circumstances that raise doubts as to the victim's veracity.*" *Singer*, 63 F.3d at 119 (emphasis added). Here, plaintiff maintains that the photo array was improperly suggestive because it consisted of six photographs depicting six different individuals with braided hair (corn rows) "as to ensure that [plaintiff] would be selected by Levi Smith."[11] (Pl.'s Mem. in Opp. to County Defs.' Mot. for Summ. J. 13.) As a threshold matter, plaintiff did not submit a copy of the photo array that he claims was suggestive. In any event, even without a copy of the array itself, plaintiff's argument as to why it was suggestive fails on its face. In particular, to the extent plaintiff argues that it was suggestive because plaintiff had braided hair and all six individuals in the array had braided hair, such an argument supports the defendants' position that it was not suggestive. In other words, if the other individuals did not have braided hair, the argument would be that the photo array was suggestive because the hair style itself pointed only to plaintiff. In short, the use of six individuals with the same hairstyle rendered the photo array *less* suggestive, not more suggestive, as plaintiff contends. *Cf. United States v. Eltayib*, 88 F.3d 157, 166 (2d Cir. 1996) ("A photo array is improperly suggestive if the picture of an accused, matching descriptions given by the witness, *so stood out from all of the other photographs* as to suggest to an identifying witness that that person was more likely to be the culprit.") (emphasis added) (internal

---

[11] Plaintiff appears to be contending that the array was suggestive, and probable cause is undermined, not because the photo array was suggestive on its face or in the procedure employed with the witness, but rather because there was an insufficient basis to place plaintiff in the photo array in the first place. However, that argument lacks merit. Although probable cause is necessary for the arrest, there is no requirement that probable cause, or any other legal threshold, be met to place a suspect's photograph in an array. *See, e.g.*, *DeChirico v. Walker*, 558 F. Supp. 2d 355, 360 (E.D.N.Y. 2008) (noting that suspect included in photo array on the basis of an officer's hunch); *Peace v. Scully*, No. 91 CIV. 5771 (LBS), 1992 WL 84635, at *3 (S.D.N.Y. Apr. 13, 1992) (finding probable clause where an anonymous tip was used to place a photograph in an array that was then identified by eyewitnesses); *see also Potter v. People*, 56 V.I. 779, 790 (2012) ("Here, although it is not abundantly clear, it appears that Potter argued that the police possessed insufficient evidence to place Potter in the photo arrays shown to the two witnesses in the first place . . . . However, Potter cited no authority—and our research has produced none—to suggest that constitutional rights are violated when a defendant's image is placed in a photo array as a result of an investigation . . . . Had the police's suspicions been unfounded, the witnesses would not have selected Potter from the photo array. The mere presence of his picture within the array did not violate any cognizable right."); *People v. Varnado*, Nos. B188489, B194298, B195683, 2007 WL 3025083, at *5 (Cal. Ct. App. Oct. 17, 2007) ("A lawful arrest requires probable cause, but inclusion of a suspect in a photo array does not even require reasonable suspicion and may be done on a pure hunch."). Thus, the identification of the plaintiff by the victim is not rendered suggestive simply because plaintiff believes law enforcement should have had more evidence against him before placing him in a non-suggestive photo array.

quotation marks and brackets omitted).[12] Thus, there is no evidence that the photo array was inherently suggestive so as to undermine its reliability, nor is there any evidence that the police engaged in improper conduct during the interview of Smith and his identification of plaintiff.

Concluding that the Smith identification was not the product of an unduly suggestive photo array, the Court turns to plaintiff's contention that Hughlett's statements to the police exculpating plaintiff so undermined the Smith identification that the police lacked probable cause to arrest plaintiff.

The Second Circuit has held consistently that conflicting accounts of a crime do not vitiate the probable cause established by an eyewitness identification or alleged victim of a crime. *See Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (conflicting accounts of arrestee and two eyewitnesses did not undermine probable cause established by eyewitness's statements inculpating arrestee); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (arresting officer entitled to believe victim's account of a fight, notwithstanding alleged assailant's cries of innocence, observing that "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest"); *Singer*, 63 F.3d at 113, 119 (concluding probable cause existed where police officer was presented with different stories from alleged victim and arrestee). Applying this principle in *Gaston v. City of New York*, the United States District Court for the Southern District of New York held that an arresting officer had probable cause to arrest the plaintiff based on the alleged victim's identification of the plaintiff in a photo array, notwithstanding the fact that the plaintiff's wife had provided an alibi for the plaintiff to the arresting officer. *See* 851 F. Supp. 2d 780, 788–91 (S.D.N.Y. 2012). That decision recognized that "the police have 'no obligation to investigate' a defendant's alibi and 'any failure to do so would not have vitiated the existence of probable cause.'" *Id.* at 791 (quoting *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 224 (E.D.N.Y. 2007)). Other courts in the Second Circuit have reached the same result when encountering similar situations. *See Christman v. Kick*, 342 F. Supp. 2d 82, 88 (D. Conn. 2004) ("[I]t would seem that a police officer may chose [sic] to rely on either of two conflicting sworn statements in determining probable cause . . . ."); *Pawlicki v. City of Ithaca*, 993 F. Supp. 140, 145 (N.D.N.Y. 1998) ("Even when an arresting officer is faced with competing accounts from different eyewitnesses, an officer is entitled to make an arrest based on believing the testimony of one side or the other . . . .");

---

[12] Additionally, plaintiff does not argue that a jury could reasonably infer that the police coerced Smith into identifying plaintiff from the fact that Hughlett had been coerced into implicating plaintiff. Nonetheless, the Court has considered the possibility but cannot find any decision to support such a claim. To be sure, if the police coerced Hughlett into implicating plaintiff, then "[t]he circumstances of this arrest raise questions as to the motivation of the" police; however, "motivation is not a consideration in assessing probable cause." *Singer*, 63 F.3d at 119. Moreover, in the context of a Section 1983 action, even evidence obtained unlawfully may provide the police with probable cause to arrest. *See Townes v. City of New York*, 176 F.3d 138, 145, 149 (2d Cir. 1999) (in Section 1983 claim for false arrest, officers had probable cause to arrest plaintiff after discovering handguns in unlawfully stopped taxi cab; the "lack of probable cause to stop and search does not vitiate the probable cause to arrest[ ] because . . . the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant.").

*Kruppenbacher v. Mazzeo*, 744 F. Supp. 402, 407 (N.D.N.Y. 1990) (same); *Collom v. Vill. of Freeport*, 691 F. Supp. 637, 640 (E.D.N.Y. 1988) (same).

Applying these established principles to the instant case, the Court holds that defendants lawfully arrested plaintiff based on Smith's identification of plaintiff as one of the culprits, notwithstanding Hughlett's protestations of plaintiff's innocence.[13] Because the police had probable cause to arrest plaintiff on the basis of Smith's identification alone, plaintiff's false arrest and false imprisonment claims cannot survive summary judgment against any defendant.[14] *See, e.g.*, *Jenkins*, 478 F.3d at 92–93 ("Even when the facts are viewed in the light most favorable to [plaintiff], the Golden and Tummings lineups were not so flawed as to undermine probable cause. Thus, after [plaintiff] was identified by Golden and Tummings, his detention was lawful and summary judgment on his state and federal false arrest claims for the period after those identifications was appropriate."); *Alvarado v. City of New York*, 453 F. App'x 56, 58 (2d Cir. 2011) ("[The victim's] identification of [plaintiff] as one of his assailants . . . was sufficient probable cause for [plaintiff's] arrest. Consequently, [the Detective] was obligated neither to refrain from arrest simply because [plaintiff] provided a potentially exculpatory story nor to follow up on that story prior to making the arrest."); *Henning v. City of New York*, No. 09-CV-3998 (ARR)(LB), 2012 WL 2700505, at *4 (E.D.N.Y. July 5, 2012) (given the absence of any evidence that the photo array procedure was suggestive, "the identification of plaintiff as one of the perpetrators by the complaining witness provided sufficient probable cause to arrest plaintiff, and his claims for false arrest and false imprisonment are, consequently, properly dismissed").

2. Malicious Prosecution

Next, defendants move for summary judgment on the malicious prosecution claims against them, asserting that plaintiff's prosecution was supported by probable cause.[15] For the reasons set forth below, the Court concludes that summary judgment on the malicious prosecution claims is warranted for all individual defendants except Det. Lemma (and, as noted *infra*, the claim against the County under *Monell* shall also proceed to trial).[16]

---

[13] It is worth noting here that Hughlett does not claim to have provided specific information to the police concerning plaintiff's alibi for the Smith robbery— specific information that might have raised a red flag about plaintiff's innocence. Instead, Hughlett claims only that he disputed plaintiff's involvement in the robbery.

[14] Given the Court's analysis and ruling in favor of defendants, plaintiff's cross-motion for summary judgment on this claim is denied.

[15] Det. Lemma does not address the malicious prosecution claims in his memoranda supporting his motion for summary judgment, but in the introduction to his memorandum of law in support of his motion for summary judgment, he states that he is moving for summary judgment on all claims against him. (Lemma's Mem. in Supp. of Mot. for Summ. J. 1.) In any event, for the reasons set forth *infra*, the Court denies Det. Lemma's motion for summary judgment as to plaintiff's malicious prosecution claims.

[16] The Court notes that the Second Circuit has explained that a claim can exist under the Fourth Amendment right to be free from prolonged detention when readily available exculpatory evidence existed and a law enforcement official intentionally hid such evidence or was deliberately indifferent to the arrestee's constitutional right to be free from prolonged detention. *See Russo v. City of Bridgeport*, 479 F.3d 196, 210 (2d Cir. 2007). However, plaintiff has pled the violation as a malicious prosecution claim and, thus, the Court analyzes it under that standard.

"Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law—in this case, New York state law—for such rules." *Conway*, 750 F.2d at 214. "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Blake*, 487 F. Supp. 2d at 211 (quoting *Jocks*, 316 F.3d at 136) (internal quotation marks omitted).

In the instant case, only the final two elements are in dispute. As to the third element, even though the Court has concluded that plaintiff's *arrest* was supported by probable cause, the issue remains whether plaintiff's "continued prosecution was similarly supported." *Crews*, 2007 WL 4591325, at *9. As the Second Circuit has held,

> Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause. . . . In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact. . . . The New York Court of Appeals has noted that the failure to make a further inquiry when a reasonable person would have done so may be

> evidence of lack of probable cause.

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citations and quotation marks omitted); *see Korthas v. City of Auburn*, No. 5:04-CV-537 (NPM/GHL), 2006 WL 1650709, at *15 (N.D.N.Y. June 9, 2006) ("Police officers may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause . . . . [A] failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause." (internal citations and quotation marks omitted)). Concerning the fourth element, malice, "[i]n most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Lowth*, 82 F.3d at 573 (quoting *Conkey v. New York*, 74 A.D.2d 998, 999 (N.Y. App. Div. 1980)); *see Cunninham v. New York City*, No. 04-CV-10232 (LBS), 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same); *Mesiti v. Wegman*, 307 A.D.2d 339, 341 (N.Y. App. Div. 2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.'" (quoting *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977))).

Here, Det. Lemma learned on June 1, 2005 that plaintiff had been in jail during the Smith robbery. Instead of bringing this exculpatory evidence to prosecutors, however, Det. Lemma decided to "[l]et the chips fall where they may." Plaintiff's evidence of Det. Lemma's deliberate withholding of clear exculpatory evidence supports the third element of a malicious prosecution claim—namely, a lack of

probable cause.[17] In other words, the probable cause that existed based upon the Smith identification would be vitiated by the exculpatory evidence that plaintiff had been in jail at the time of the robbery. As to the fourth element of malice, the evidence of a lack of probable cause at that juncture and the surrounding circumstances are sufficient to create a genuine issue of disputed fact as to whether Det. Lemma harbored malice toward plaintiff. Certainly a jury could reasonably infer that malice motivated Det. Lemma's inaction. *See, e.g.*, *Lowth*, 82 F.3d at 573. Alternatively, if all the evidence is construed most favorably to Det. Lemma, a reasonable jury could credit Det. Lemma's explanation for remaining quiet (namely, that plaintiff would have known that he had been in jail during the Smith robbery, and would have brought his alibi to the court's attention at arraignment) and find that Det. Lemma's actions were wrong and/or negligent, but were not malicious. Given this disputed fact, neither side can prevail on summary judgment, and plaintiff's malicious claims against Det. Lemma must therefore proceed to trial.

Additionally, for the reasons discussed *infra*, plaintiff's *Monell* claim against the County will proceed to trial based on the existence of a genuine issue of fact as to whether the County failed to train and supervise Det. Lemma regarding the proper handling of exculpatory evidence.

All other defendants are entitled to summary judgment on the malicious prosecution claims. As to Dep. Insp. Barbieri, Det. Lt. Fal, Det. Holland, and Officer Annarumma, there is no evidence suggesting that they learned of plaintiff's alibi for the Smith robbery after plaintiff's arrest. The Court rejects plaintiff's attempts to rely on the error in the felony complaint to hold otherwise. Specifically, plaintiff cannot maintain that these defendants intentionally listed the wrong date on his felony complaint in order to prevent him from asserting his alibi, because plaintiff cannot point to any evidence that these defendants actually knew of his alibi before completing plaintiff's felony complaint.

The same holds true for Det. Messe. Det. Messe did testify that, sometime in September 2005, Det. Lemma told him that plaintiff may have been in jail during the Smith robbery. Plaintiff does not rely on this testimony as the basis for his malicious prosecution claims against Det. Messe, but even if he did, this testimony could not support a malicious prosecution claim against Det. Messe. There is no evidence suggesting Det. Messe knew that Det. Lemma would withhold evidence of plaintiff's alibi from prosecutors. *Cf. Blake*, 487 F. Supp. 2d at 207 ("witnessing officer may be liable for failing to intercede to prevent the constitutional violations of other officers where the officer had reason to know such a violation was occurring and had a realistic opportunity to intercede"). In fact, Det. Messe explained that he interpreted Det. Lemma's comment to mean that Det. Lemma would act on that information, and nothing in the record contradicts this explanation.

As for ADA Madey and ADA Higgins, the Court concludes that absolute immunity

---

[17] The Court is aware that a grand jury indictment gives rise to a presumption of probable cause. *See Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). Here, however, the evidence of Det. Lemma's suppression of exculpatory information clearly can be used by plaintiff in this case to overcome such presumption. *See id.* (showing of "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith" can overcome presumption of probable cause).

shields them from liability for malicious prosecution. *See infra*.

Accordingly, summary judgment in defendants' favor is warranted on the malicious prosecution claim against all individual defendants except Det. Lemma. For the reasons stated herein, plaintiff's cross-motion for summary judgment on this claim is denied.

### 3. Municipal Liability

Having determined that plaintiff's malicious prosecution against defendant Lemma survives summary judgment, the Court must determine whether the County can be held liable under Section 1983. The County defendants move to dismiss the Section 1983 claims against the County on the basis that plaintiff has failed to establish the existence of any municipal policy or custom that caused plaintiff's alleged civil rights violations. For the reasons that follow, the Court concludes that there is a genuine issue of fact as to the County's alleged failure to train and/or supervise Det. Lemma that precludes summary judgment on the municipal liability claim.

The Supreme Court has explained that a municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Social Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force

of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (citing *Monell*, 436 U.S. at 691) (internal quotation marks omitted). Moreover, a policy, custom, or practice of the entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern*, 93 F.3d at 44). However, a municipal entity may be held liable only where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

In his memorandum opposing summary judgment for the County, plaintiff rests his claim of municipal liability on a theory of failure to train and supervise. "The failure to train or supervise [municipal] employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference exists when the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation'"; and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 195–96 (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). Recently, the Supreme Court has reiterated that "'[a] pattern of similar

constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (quoting *Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)). However, "'in a narrow range of circumstances,'" where unconstitutional actions are the obvious consequence of a failure to train, "a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 1361 (quoting *Bryan Cnty.*, 520 U.S. at 409).[18]

Turning to the case at bar, the Court concludes that there is a triable issue of fact as to whether municipal policymakers exhibited deliberate indifference by failing to give adequate training to police officers on how to handle the discovery of exculpatory evidence. After learning that plaintiff had been in jail during the Smith robbery, Det. Lemma testified that he "[l]et the chips fall where they may" because he assumed that someone else would act on plaintiff's alibi. (Lemma Dep. at 51.) Lemma's explanation for his behavior provides some evidence for plaintiff's position that the County does not adequately train its police on how to handle the discovery of exculpatory evidence during the pendency of criminal proceedings. Moreover, under the deliberate indifference test, there is also a disputed issue of fact as to whether (1) policymakers knew to a moral certainty that the police would confront this this type of situation, (2) the situation presented Det. Lemma with a difficult choice of the sort that training or supervision would have made less difficult, and (3) the wrong choice by an officer or detective in Det. Lemma's position would frequently cause the deprivation of a citizen's constitutional rights. *See Walker*, 974 F.2d at 298 (facts establishing that "the police department had no policy on the proper handling of exculpatory evidence . . . might, in the proper case, provide the basis for a deliberate indifference claim under the standards laid out above"). Finally, if plaintiff's evidence is credited and construed most favorably to plaintiff, a reasonable jury could conclude that, because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations, such that a single incident can give rise to *Monell* liability. *See Gregory v. City of Louisville*, 444 F.3d 725, 753–54 (6th Cir. 2006) (concluding that police officers "regularly uncover exculpatory materials," and that the failure to train police on proper handling of this material would have the "highly predictable consequence" of constitutional violations). *Cf. Connick*, 131 S. Ct. at 1361 ("Failure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability" because prosecutors, unlike police officers, receive legal training before becoming prosecutors, and can thus be expected to understand their basic *Brady* obligations without training.).

In sum, the Court concludes that plaintiff's Section 1983 claim against the County under *Monell* may proceed to trial on a failure-to-train and failure-to-supervise theory. Plaintiff's state law malicious

---

[18] For example, in *Canton*, the Supreme Court hypothesized that a municipality's decision not to train its police officers on the constitutional limits to the use of deadly force "could properly be characterized as 'deliberate indifference' to constitutional rights" because the need for such training is "so obvious." 489 U.S. at 390 n.10.

prosecution claim against the County survives, as well.[19]

## C. Plaintiff's State Law Claims

Finally, plaintiff alleges the following claims under New York law: assault, battery, IIED, and NIED. The Court considers each in turn.

### 1. Assault and Battery

In support of his causes of action for assault and battery, plaintiff maintains that his arrest was unlawful (unsupported by probable cause), and that defendants used excessive force to arrest him. Because the Court has already determined that plaintiff's arrest was supported by probable cause, the only issue left to consider is whether a reasonable jury could find that defendants used excessive force during plaintiff's arrest. *See Cunningham v. United States*, 472 F. Supp. 2d 366, 383 (E.D.N.Y. 2007) (where court determines that arrest supported by probable cause, "the question before the court becomes whether the force used to effectuate the arrest was excessive"). *Cf. Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) ("If an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault

and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest.").

"Courts interpreting New York state law of assault and battery as it applies to police officers have stated that 'the essential elements of [§ 1983] excessive force and state law assault and battery claims are substantially identical.'" *Dotson v. Farrugia*, No. 11-CIV-1126 (PAE), 2012 WL 996997, at *7 (S.D.N.Y. Mar. 26, 2012) (quoting *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009)); *see Posr*, 944 F.2d at 94–95.[20] A police officer's use of force is excessive "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d. Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

Here, plaintiff bases his excessive force claim on the manner in which he was handcuffed. "'Courts apply a separate standard to claims for excessive force in the use of handcuffs.'" *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (quoting *Sachs v. Cantwell*, No. 10 Civ. 1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012)). To determine the reasonableness of handcuffing, the Court considers "evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree

---

[19] "Unlike cases brought under § 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002). "No municipal custom or policy need be proven to establish the liability of the [municipality] for violation of . . . state law, for '[m]unicipalities surrendered their common-law tort immunity for the misfeasance of their officers and employees long ago.'" *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012) (quoting *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (1983)). The Court thus concludes that plaintiff's state law malicious prosecution claim against the County survives on a theory of *respondeat superior*.

[20] "New York defines 'assault' as 'an intentional placing of another person in fear of imminent harmful or offensive contact' and 'civil battery [as] an intentional wrongful physical contact with another person without consent.'" *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (quoting *Charkhy v. Altman*, 252 A.D.2d 413, 414 (1st Dep't 1998) (internal quotation marks omitted)).

of injury to the wrists." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005).

Applying that standard here, triable issues of fact exist as to the reasonableness of Officer Annarumma's handcuffing of plaintiff. Plaintiff contends that he did not resist arrest. Nonetheless, according to plaintiff, the arresting officers—among them, Officer Annarumma—hurt plaintiff's arm by twisting it around his back to handcuff him. When plaintiff told them he was in pain, one of the officers allegedly responded by telling plaintiff to "[s]hut up." Plaintiff further alleges that, on the way to the precinct, plaintiff repeated to the officers that they had hurt him. Plaintiff testified that the handcuffs caused him soreness and bruising on his wrists and shoulder. Although his wrists remained sore for only a few hours, plaintiff allegedly had a "sharp pain" in his shoulder that lasted for approximately one week.

The Court recognizes that a plaintiff who suffers only *de minimis* injuries may not be able to survive summary judgment on an excessive force claim; however "the Second [C]ircuit has indicated that a very minimal injury is sufficient to trigger potential liability" for excessive force. *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009) (Report & Recommendation) (recommending denial of summary judgment on excessive force claim based on allegation that detective pressed plaintiff's head against a table, and plaintiff's testimony that this resulted in pain for "about an hour"); *accord Sforza v. City of New York*, No. 07 Civ. 6122(DLC), 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("[P]laintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient.").

Viewing the facts in the light most favorable to plaintiff and resolving all factual ambiguities in his favor, the Court concludes that a rational jury could find that the pain plaintiff claims to have experienced was sufficiently severe to warrant liability for assault and battery, even though plaintiff did not seek medical care. *See Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) (explaining, in reversing district court's grant of summary judgment on excessive force claim, that plaintiff's failure to seek medical treatment was "not fatal" to her claim, and that focus of inquiry should be reasonableness of force under the circumstances). Thus, summary judgment is not appropriate on this record. *See, e.g.*, *Lucky v. City of New York*, No. 03 Civ. 1983 (DLC), 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004) ("While [plaintiff's] injuries appear *de minimis*, his statements that he was shoved in the police car in a manner that injured his shoulder and that the handcuffs were placed so as to leave red marks on his wrists raise material issues of fact not addressed by the defendants. Summary judgment is therefore inappropriate on [plaintiff's] claim for excessive force.").

Consequently, plaintiff's assault and battery claims against Officer Annarumma survive summary judgment. In addition, the assault and battery claims against the County survive because "the County could still be liable for these claims under a *respondeat superior* theory." *Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 184 & n.27 (E.D.N.Y. 2010) (collecting cases).

However, the Court grants summary judgment on the assault and battery claims for all other defendants. There is simply no evidence that any other defendant actually

participated in plaintiff's arrest.[21] *See, e.g., De Ratafia v. Cnty. of Columbia*, No. 13-CV-174 NAM/RFT, 2013 WL 5423871, at *9 (N.D.N.Y. Sept. 26, 2013) ("In the absence of factual allegations establishing that defendant . . . was personally involved in the alleged state law torts of assault [and] battery . . . these claims . . . fail to state a cause of action under New York law."). For the same reason—lack of personal involvement—plaintiff cannot base his assault and battery claims against defendants on the fact that he was strip searched at least thirty times while in jail. Finally, plaintiff cannot maintain an assault claim on the basis that defendants threatened him with imprisonment immediately following his arrest. The Court has already determined that, at the time of plaintiff's arrest, defendants had probable cause to believe that he had committed the Smith robbery. It follows that defendants could have reasonably raised the threat of imprisonment in their interrogation of him, and plaintiff does not cite any authority to the contrary.

## 2. Infliction of Emotional Distress

In order to assert a valid IIED claim under New York law, a plaintiff must demonstrate "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Id.* (citation omitted). The conduct alleged must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 558 (1978)). "Further, the fourth element, severe emotional distress, must be supported by medical evidence." *Ainbinder v. Money Ctr. Fin. Grp., Inc.*, No. 10-CV-5270 (SJF)(AKT), 2013 WL 1335997, at *11 (E.D.N.Y. Feb. 28, 2013), *report & recommendation adopted*, 2013 WL 1335893 (E.D.N.Y. Mar. 25, 2013); *see Allam v. Meyers*, 906 F. Supp. 2d 274, 282 (S.D.N.Y. 2012) (collecting cases).

In the instant case, plaintiff relies exclusively on his own testimony to support the fourth element of his IIED claim; there is no medical evidence establishing severe emotional distress. Such evidence does not suffice to survive a motion for summary judgment. *See Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012) ("Courts routinely grant summary judgment against plaintiffs where they have failed to present medical evidence demonstrating severe emotional injury.");

---

[21] The Court recognizes that plaintiff has stated in a sworn declaration that Det. Messe and Det. Holland, among others, "aggressively and improperly handcuffed" him, but this conclusory allegation is insufficient to maintain a claim against them because the evidence in the record regarding the handcuffing relates only to Officer Annarumma. As such, plaintiff's conclusory allegation is insufficient to preclude summary judgment for Det. Messe and Det. Holland. *See, e.g.*, *Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303 KAM JMA, 2013 WL 1316712, at *10 (E.D.N.Y. Mar. 28, 2013) ("'[A] self-serving affidavit that merely reiterates conclusory allegations in affidavit form is insufficient to preclude summary judgment.'" (quoting *United Magazine Co. v. Murdoch Magazines Distrib., Inc.*, 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005), *aff'd sub nom. United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008))).

*accord Biggs v. City of New York*, No. 08 Civ. 8123 (PGG), 2010 WL 4628360, at *9 (S.D.N.Y. Nov. 16, 2010) (granting summary judgment for defendants where plaintiff "offered no medical evidence of severe emotional injury"); *Pepe v. Maklansky*, 67 F. Supp. 2d 186, 187 n.1 (S.D.N.Y. 1999) (same).

Even assuming *arguendo* that plaintiff could meet all four elements of an IIED claim, "New York courts do not allow IIED claims where 'the conduct complained of falls well within the ambit of other traditional tort liability.'" *McGrath v. Nassau Health Care Corp.*, 217 F. Supp. 2d 319, 335 (E.D.N.Y. 2002) (quoting *Lian v. Sedgwick James, Inc.*, 992 F. Supp. 644, 651 (S.D.N.Y. 1998)). "IIED claims that are duplicative of other tort claims should therefore be dismissed." *Id.* (citing *Lian*, 992 F. Supp. at 651). Here, the facts supporting plaintiff's IIED claim are the very same facts that support his claims for malicious prosecution, as well as assault and battery. Consequently, defendants are entitled to summary judgment on the IIED claim. *See Brewton v. City of New York*, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008) ("[B]ecause the conduct comprising [plaintiff's] intentional infliction of emotional distress claim is encompassed entirely within her state law claims for false arrest and malicious prosecution, this cause of action must be dismissed for it does not lie as a matter of state law.").

Similarly, "a claim for [NIED] should be dismissed where the conduct for the underlying claim may be redressed by way of traditional tort remedies." *Deronette v. City of New York*, No. 05 CV 5275 (SJ), 2007 WL 951925, at *5–6 (E.D.N.Y. Mar. 27, 2007) (dismissing NIED claim that was "clearly encompassed in Plaintiff's claims for false arrest, false imprisonment, malicious prosecution, abuse of process, and libel and slander"); *accord Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005). Accordingly, the Court also grants summary judgment for defendants on plaintiff's NIED claim.[22]

## IV. IMMUNITY

### A. Absolute Immunity

Defendants argue that ADA Madey and ADA Higgins are entitled to absolute immunity. For the reasons set forth below, the Court concludes that ADA Madey and ADA Higgins are entitled to absolute immunity for malicious prosecution based on (1) their alleged failure to inform plaintiff of the error on the felony complaint; and (2) their alleged presentation of evidence against plaintiff to the grand jury, despite knowing that plaintiff was in jail at the time of the Smith robbery.

It is well settled that prosecutors enjoy absolute immunity from liability in suits seeking monetary damages for acts carried out in their prosecutorial capacities, *i.e.*, those acts "intimately associated with the judicial phase of the criminal process," but not for "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976); *see, e.g.*, *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005). "Prosecutorial immunity from § 1983 liability is broadly defined, covering 'virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate.'" *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (quoting *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994)). For example, in *Hill*,

---

[22] For these same reasons, plaintiff's cross-motion for summary judgment on this claim is denied.

the Second Circuit held than an Assistant District Attorney's alleged acts of, *inter alia*, "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" were "clearly protected by the doctrine of absolute immunity as all are part of his function as an advocate." *Id.* at 661. Similarly, the Second Circuit has held that absolute immunity extends to a prosecutor's "'knowing use of perjured testimony' and the 'deliberate withholding of exculpatory information,'" even where the prosecutor knowingly prosecutes an innocent person. *Shmueli*, 424 F.3d at 237–38 (quoting *Imbler*, 424 U.S. at 431 n.34).

Here, ADA Madey and ADA Higgins clearly have absolute immunity for their alleged failure to inform plaintiff that the felony complaint listed the wrong date of offense, and for their alleged presentation of false evidence to the grand jury. Such actions were taken in their capacities as prosecutors, not investigators.

Of course, to the extent it is alleged that ADA Madey questioned Hughlett and coerced a false statement implicating plaintiff, he was assisting police in the investigation of an unsolved robbery. Accordingly, the doctrine of absolute immunity would not shield ADA Madey from liability in a false arrest claim for his participation in allegedly coercing Hughlett to implicate plaintiff. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 275 (1993) (absolute immunity does not cover "a prosecutor's fabrication of false evidence during the preliminary investigation of an unsolved crime"); *see also Morse v. Fusto*, No. 07-CV-4793 (CBA)(RML), 2013 WL 4647603, at *6 (E.D.N.Y. Aug. 29, 2013) (citing *Zahrey v. Coffey,* 221 F.3d 342, 353–54) (2d Cir. 2001) ("A prosecutor who fabricates evidence in his investigative role, to whom it was reasonably foreseeable that

such evidence would later be used in his advocacy role before the grand jury, is equally liable for an ensuing deprivation of liberty."). However, as noted *supra*, because there was probable cause to arrest plaintiff independent of the allegedly coerced statement from Hughlett (namely, the identification by Smith), no false arrest claim lies as a matter of law against ADA Madey or any other defendant.

Thus, the activities of ADA Madey and ADA Higgins in connection with the prosecution itself are clearly protected by absolute immunity, and any investigative conduct, although not shielded by absolute immunity, cannot be the basis for a false arrest claim against them because of the existence of probable cause to arrest independent of the wrongful conduct alleged with respect to the Hughlett interview. Accordingly, the claims against ADA Madey and ADA Higgins cannot survive summary judgment.

### B. Qualified Immunity

The County defendants also argue that they are entitled to qualified immunity. The Court disagrees.

According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). In particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at the summary judgment stage "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most

favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (citations and quotation marks omitted)).

Here, the Court examines qualified immunity with respect to plaintiff's claim of assault and battery against Officer Annarumma.[23] First, it is axiomatic that the right that plaintiff asserts—namely plaintiff's right to be free from excessive force—is clearly established. *See Maxwell*, 380 F.3d at 108. Second, there are disputed factual issues as to Officer Annarumma's conduct during plaintiff's arrest, which are relevant to the determination of whether it was objectively reasonable for him to believe that his acts were lawful. Those factual issues preclude summary judgment on qualified immunity grounds. *See, e.g.*, *Pooler v. Hempstead Police Dep't*, 897 F. Supp. 2d 12, 29–30 (E.D.N.Y. 2012).

---

[23] It is well settled that qualified immunity would not exist if a plaintiff proved that a police officer intentionally withheld exculpatory information from prosecutors. *See, e.g.*, *Russo v. City of Bridgeport*, 479 F.3d 196, 211–12 (2d Cir. 2007) (no qualified immunity if police officers intentionally hid exculpatory evidence). However, the Court need not consider this issue at this juncture because Det. Lemma did not argue for qualified immunity.

## V. CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of all defendants as to plaintiff's false arrest, false imprisonment, IIED, and NIED claims. As for plaintiff's malicious prosecution claims, the Court grants summary judgment in favor of all individual defendants except Det. Lemma. The motion for summary judgment by the County on the municipal liability claim under Section 1983, as well as the state law malicious prosecution claim, is denied. Finally, concerning the assault and battery claims, the Court grants summary judgment for all defendants except the County and Officer Annarumma. Defendants' motions for summary judgment are denied in all other respects. Plaintiff's motion for summary judgment is denied in its entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 11, 2014
        Central Islip, New York

\*      \*      \*

Plaintiff is represented by Frederick K. Brewington, Law Offices of Frederick K. Brewington, 556 Peninsula Boulevard, Hempstead, NY 11550. The County defendants are represented by Sherri Anne Jayson, Cuomo LLC, 9 East 38th Street, 3rd Floor, New York, NY 10016. Defendant Det. Lemma is represented by Mitchell Garber and Douglas LaBarbera, Worth, Longworth & London, LLP, 111 John Street Suite 640, New York, NY 10038.